IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 30, 2007 Session

## STATE OF TENNESSEE v. ALBERTO CAMACHO

**Appeal from the Circuit Court for Sevier County**
**No. 9265 & 9667     Rex Henry Ogle, Judge**

**No. E2005-02699-CCA-R3-CD - Filed October 29, 2007**

Appellant, Alberto Camacho, was indicted on six counts of theft and one count of impersonation of a licensed professional. After a jury trial, Appellant was convicted of four counts of theft over one thousand dollars, a Class D felony, two counts of theft over five hundred dollars, a Class E felony, and one count of impersonation of a licensed professional, a Class E felony. The trial court sentenced Appellant to four years for each Class D felony and two years for each Class E felony. The trial court ordered the sentences to run concurrently, for a total effective sentence of four years. The trial court further ordered Appellant to serve 200 days of the sentence day-for-day, with the balance of the sentence to be served on supervised probation. Appellant was also ordered to pay $750 per month toward restitution. Appellant appeals, arguing that the evidence was insufficient to support his convictions, that the trial court improperly instructed the jury on the charge of impersonation of a licensed professional and that his sentence is improper. Because the evidence was sufficient to support the convictions, the trial court properly instructed the jury and the trial court properly applied enhancement factors (2) and (16), we affirm the judgments of the trial court. However, because the trial court erred in imposing a sentence ordering Appellant to serve 200 days of the sentence *day-for-day*, we reverse that portion of the sentence and remand to the trial court for entry of an order deleting the requirement that the sentence be served day-for-day.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and J. CURWOOD WITT, JR., J., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, (on appeal) and Assistant Public Defender, Micaela Burnham, Sevierville, Tennessee, (at trial) for the appellant, Alberto Camacho.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General and Steven Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

In July of 1999, Appellant, Tony Ownby, Jose Pruna and Jose Devalle purchased Great Smoky Mountain Vacation Rentals from Don Shults. Great Smoky Mountain Vacation Rentals was licensed by the Tennessee Real Estate Commission as a vacation lodging service and primarily contracted with cabin and chalet owners in the Gatlinburg, Tennessee area to rent out the cabins and chalets to vacationers. The owners had a contract with Great Smoky Mountain Vacation Rentals wherein Great Smoky Mountain Vacation Rentals rented the properties and performed maintenance on the properties for a percentage of the rental income.

On March 9, 2001, the license for Great Smoky Mountain Vacation Rentals was revoked by the Tennessee Real Estate Commission after an audit revealed that the business' escrow account had a shortage of over $87,000. In January of 2003, Appellant was charged with six counts of theft. In October of 2003, Appellant was charged with one count of impersonation of a licensed professional because he continued to operate Great Smoky Mountain Vacation Rentals after the revocation of the license.

At trial in July of 2005, James Ingalls, a Hudson, Florida resident, testified that he had owned a chalet in Sevier County, Tennessee since 1995. In 1999 and 2000, Mr. Ingalls contracted with Great Smoky Mountain Vacation Rentals to rent his chalet. Pursuant to the agreement, Great Smoky Mountain Vacation Rentals handled the rental of the chalet and Mr. Ingalls received a monthly check on the 15th of each month that accounted for sixty percent of the rental. Great Smoky Mountain Vacation Rentals received forty percent of the rental plus any expenses that were incurred in the maintenance of the building. Mr. Ingalls received a monthly report from Great Smoky Mountain Vacation Rentals detailing the monthly rentals.

In December of 1999, Mr. Ingalls received a monthly rental report indicating that he and his partner Catherine Edwards were owed $1,550.84. Mr. Ingalls never received the money. He and Ms. Edwards called Great Smoky Mountain Vacation Rentals several times and were told that the check had been sent to them. Eventually, Great Smoky Mountain Vacation Rentals sent Mr. Ingalls a copy of the check that was supposedly sent to him in the mail. Mr. Ingalls testified that he never received or cashed the actual check. Mr. Ingalls was under the impression that any monies that he was owed would remain in an escrow account until they were sent to him.

Terry Shelton, a resident of Houston, Texas, also owned a cabin in Sevier County. She and her husband built the cabin in 2000 and had it on the rental program with Great Smoky Mountain Vacation Rentals for five years. Mrs. Shelton testified that she met Appellant when she and her husband were looking for a company to rent the cabin for them because they lived so far away. Mrs. Shelton also met Tony Ownby, but was told that Appellant handled all of the finances and that Mr.

Ownby handled all of the maintenance on the cabins. According to Mrs. Shelton, her agreement with Great Smoky Mountain Vacation Rentals provided for a sixty/forty split of the rental income with sixty percent of the income going to Mr. and Mrs. Shelton. Mr. and Mrs. Shelton were told that Mr. Ownby left the business in May of 2000.

In December of 2000, Mrs. Shelton did not receive a check from Great Smoky Mountain Vacation Rentals. Eventually, Mrs. Shelton received a check for the December 2000 and January 2001 rentals, but both checks were returned for insufficient funds. Mrs. Shelton contacted Great Smoky Mountain Vacation Rentals and was told that the account was closed. The Sheltons were sent a replacement check that included a signed note written by Appellant. Mrs. Shelton testified that everything went along fine after that incident until about May or June of 2001, when the checks from Great Smoky Mountain Vacation Rentals did not clear when she deposited them into her bank. Again, Mrs. Shelton contacted the office at Great Smoky Mountain Vacation Rentals. This time, she discovered that her telephone number had been blocked and she was unable to call the office. Mrs. Shelton was finally able to call Great Smoky Mountain Vacation Rentals from her work telephone.

Mrs. Shelton informed the court that she and her husband received a check for the September 2001 rental in October of 2001 in the amount of $891.33. The check was signed by Appellant. When Mrs. Shelton tried to deposit the check, it was returned for insufficient funds. At that point, Mrs. Shelton decided to check the website of Great Smoky Mountain Vacation Rentals to see when their cabin had been rented. Mrs. Shelton discovered that the cabin was rented in both October and November and testified that she did not receive a check for either month from Great Smoky Mountain Vacation Rentals. Mrs. Shelton determined that Appellant owed them $3,561 for October and November of 2001.

Mrs. Shelton testified that after she discovered that Appellant owed her more than $3,000, she again tried to contact the office. She left several messages but was unable to contact Appellant. Eventually, Mrs. Shelton's home phone and cell phone were blocked from accessing Appellant's telephone. Mr. and Mrs. Shelton decided to travel to Gatlinburg to find Appellant. Upon their arrival, they discovered that the office of Great Smoky Mountain Vacation Rentals was no longer in the same place. When they inspected their cabin, they found it to be in complete disarray. They cleaned up their cabin and continued to hunt for Appellant. They were never able to locate Appellant or an office for Great Smoky Mountain Vacation Rentals. Mr. and Mrs. Shelton never received a check for the $3,561 from October and November of 2001 and were never issued a replacement check for the $891 check that was returned for non-sufficient funds.

Yates Gilbert, a resident of Charlotte, North Carolina, testified that he owned two houses in Sevier County in Chalet Village that were listed on the rental program with Great Smoky Mountain Vacation Rentals. Mr. Gilbert met Appellant when Appellant purchased the business from Don Shults. Mr. Gilbert had contracted with Mr. Shults to rent his cabins for three or four years before Appellant bought the business. Mr. Gilbert explained that his rental experience with Mr. Shults was pleasant and that he never had any problems with the rentals.

Mr. Gilbert met Appellant in the summer of 1999, when Appellant took over the business of Great Smoky Mountain Vacation Rentals. Like the other participants in the rental program, Mr. Gilbert received a statement every month from Appellant along with a check for sixty percent of the proceeds from the rental of his cabins. Mr. Gilbert began having problems with Great Smoky Mountain Vacation Rentals in October of 1999, when the checks starting arriving late. Mr. Gilbert explained that he received an apology letter from Great Smoky Mountain Vacation Rentals, which explained that it had changed the bookkeeper.

Mr. Gilbert stated that the real problems arose when Mr. Ownby left the business in 2000. He stopped receiving checks in the fall and winter. Mr. Gilbert made several telephone calls to contact Appellant but was unable to speak with him by phone. He was always told that Appellant was either in Miami or on his way to Miami. Mr. Gilbert decided to make a special trip to the area for the sole purpose of getting his money and locking Appellant out of his houses. Mr. Gilbert was unable to locate Appellant on his trip to the area, but stopped by the office of Great Smoky Mountain Vacation Rentals to inform them that he planned to lock the house. At that point, Appellant contacted Mr. Gilbert and informed him that he was on his way back from Miami with Mr. Gilbert's money.

Mr. Gilbert explained to Appellant that he did not receive money for November and December of 2000 or January of 2001. The next morning, a person at the office of Great Smoky Mountain Vacation Rentals gave Mr. Gilbert a check for the November rentals. Mr. Gilbert explained that he wanted all of his money or he would lock the house before he left the area. Mr. Gilbert was told that Appellant was going to mail him another check. Mr. Gilbert testified that he changed the locks on his cabins before leaving the area. When Mr. Gilbert returned to his residence, he received two more checks in the mail, but Appellant still owed Mr. Gilbert for January and February rentals. Mr. Gilbert discovered that Appellant stopped payment on the checks when he tried to deposit them. All three of the checks were signed by Appellant. The checks were written for the following amounts: $2,000.73, $2,144.90 and $351.18.

Glenn Carlton Webb, another cabin owner, testified at trial. He and his wife lived in Lima, Ohio, and owned a cabin named Dreamweaver in Sevier County. Mr. Webb had his cabin on the rental program with Mr. Shults, and when the company was sold to Appellant, Mr. Webb decided to keep his cabin on the rental program with Great Smoky Mountain Vacation Rentals. Like the other cabin owners, the Webbs were on a 60/40 split with Great Smoky Mountain Vacation Rentals.

In October of 2001, Mr. Webb received a check in the amount of $968.80 for the month of September. The check was dated October 15, 2001. When Mr. Webb attempted to deposit the check, it was returned for non-sufficient funds. Mr. Webb tried to contact Appellant about the check. When he was finally able to contact someone in the office of Great Smoky Mountain Vacation Rentals, Mr. Webb was told that Appellant would return his call. Appellant never returned Mr. Webb's telephone calls. In fact, in mid-January of 2002, Mr. Webb discovered that Appellant's telephone number was disconnected. Mr. Webb never heard from Appellant about the bad check

and never received a replacement check. According to Mr. Webb, Appellant owed him $4,400 for the rental of his cabin.

Amy Winn, a resident of Ridgeway, Virginia testified that in 2001, she located Great Smoky Mountain Vacation Rentals on the Internet. She contacted Great Smoky Mountain Vacation Rentals and told them that there were twelve people in her group interested in renting a cabin for a family trip. Ms. Winn made reservations in January of 2001 for a cabin rental from July 14 through 18, 2001. Ms. Winn selected the cabin and paid a 50% deposit of $635.75 to hold the reservation. Prior to the trip, Ms. Winn's father developed health problems and the family realized that they would be unable to stay at the cabin in July. Ms. Winn cancelled her reservation on June 11, 2001. According to the cancellation policy provided to Ms. Winn at the time she made the reservation, if she cancelled her reservation within fourteen days of the arrival date, she would receive a 90% refund of her deposit.

Ms. Winn contacted the office of Great Smoky Mountain Vacation Rentals and was told that she would receive 90% of her deposit in the form of a refund on her credit card. Ms. Winn testified that as of September 2001, she had not received a refund, so she again contacted Great Smoky Mountain Vacation Rentals. The person at the office explained to Ms. Winn that a refund usually took about two months to process. Ms. Winn called Great Smoky Mountain Vacation Rentals again on October 24, 2001, to inquire about the status of her refund. At that time, Ms. Winn was told that she needed to speak with Appellant. Ms. Winn attempted to contact Appellant several times, even sending a letter by fax and mail, to no avail. At trial, Ms. Winn testified that she never received any type of credit on her credit card for the cancelled reservation.

Connie Miller, a resident of Lima, Ohio, testified that she and her husband had owned a cabin in Gatlinburg since 1993. Mrs. Miller and her husband participated in the rental program with Great Smoky Mountain Vacation Rentals. Mrs. Miller first met Appellant when Mr. Shults sold the company to Appellant and Mr. Ownby. Two or three months after the sale of Great Smoky Mountain Vacation Rentals, Mrs. Miller and her husband came to Gatlinburg to meet Appellant and Mr. Ownby. At that time, the Millers decided to keep their property on the rental program with Great Smoky Mountain Vacation Rentals. Mrs. Miller understood that Appellant was the president of the company.

Mrs. Miller explained that she did not receive a check for August 2000 rentals until she made several phone calls to Appellant's cell phone and pager. Mr. and Mrs. Miller stayed in their cabin in September of 2001. When they arrived at the cabin, they found a tremendous amount of damage to their home. Great Smoky Mountain Vacation Rentals never informed the Millers that there was damage to their cabin, and when they contacted the office, they were told that Appellant was in Florida and that Mr. Ownby was no longer associated with Great Smoky Mountain Vacation Rentals. Mrs. Miller received a check on November 4, 2001, signed by Appellant in the amount of $961.54 for the August 2001 rental. The check was returned for non-sufficient funds. Mrs. Miller was never able to get in touch with Appellant about the check.

William O. Stewart was an auditor with the Tennessee Real Estate Commission. He performed an audit on Great Smoky Mountain Vacation Rentals on May 31, 2000. Mr. Stewart went to the business to check the escrow accounts and look at the books. According to the audit, there should have been approximately $82,000 in the escrow account. However, at the time of the audit, the account was overdrawn by approximately $5,000. Thus, the audit revealed that the account was deficient for approximately $87,000. Mr. Stewart testified that Great Smoky Mountain Vacation Rentals was required by law to maintain an escrow account. Mr. Stewart reported his findings to the Real Estate Commission. After the results of the audit were disclosed, the vacation lodging license for Great Smoky Mountain Vacation Rentals was revoked.

William O. Burris, an investigator for the Regulatory Board's Division of the Department of Commerce and Insurance for the State of Tennessee, testified at trial. According to Mr. Burris, Great Smoky Mountain Vacation Rentals had a license as a vacation lodging business. The license was originally owned by Mr. Shults, but was transferred to Appellant as the new owner in 1999. According to the application for the vacation lodging license, Appellant was listed on the application as president of Great Smoky Mountain Vacation Rentals. The license was revoked on March 9, 2001, by the Tennessee Real Estate Commission.

After the revocation of the license, Mr. Burris traveled to Gatlinburg to locate Appellant, but was unable to do so. Mr. Burris noted his inability to find Appellant in his report and was then instructed to take out a warrant against Appellant because he was still doing business as Great Smoky Mountain Vacation Rentals in spite of the revocation of the license. Mr. Burris tried to locate Appellant at a residence and left his information with instructions for Appellant to contact him as soon as possible. Mr. Burris followed up by calling Appellant's cell phone several times. Appellant never contacted Mr. Burris.

Anthony Eugene Ownby testified that he was originally a firefighter and a paramedic prior to buying Great Smoky Mountain Vacation Rentals with Appellant in 1999. Mr. Ownby testified that he, Appellant and two other men bought the business from Mr. Shults. According to Mr. Ownby, he was in charge of maintenance on the rental properties and was a twenty-five percent owner in the company. Appellant ran the office and handled the business and financial aspects of Great Smoky Mountain Vacation Rentals. When owners began complaining about returned checks and about Appellant's rude attitude toward cabin owners, Mr. Ownby talked to Appellant about the problems. According to Mr Ownby, Appellant informed him that it was his company and he would run it the way he saw fit.

In early 2000, Mr. Ownby and Mr. Pruna, one of the silent partners, drew up documents to give their percentages of the business back to Appellant. From that point forward, Mr. Ownby had no association with the business or with Appellant. Mr. Ownby testified that Appellant was the president of the company.

Appellant took the stand in his own behalf. He testified that he, Mr. Ownby and two private partners purchased Great Smoky Mountain Vacation Rentals in July of 1999 from Mr. Shults.

Appellant explained that the business was successful until winter when sales dropped and the business was unable to pay its bills. Appellant then discovered that someone was taking large sums of money out of the escrow account. Appellant testified that he moved the business into his home and used "Mailbox Etc." as his business mailing address. Appellant did not recall buying Mr. Ownby's share of the business. Appellant admitted that he eventually stopped operating the business and moved back to Florida in 2002. Appellant examined several checks introduced as exhibits and denied that they contained his signature. Appellant tried to diffuse the situation by explaining that they made mistakes in running the business, but that they did not try to cheat anyone.

On cross-examination, Appellant stated that he did not know that there were over forty complaints filed against him. Appellant admitted that he wrote some of the checks at issue, but insisted that other checks were forgeries. Appellant also admitted that he stopped payment on some of the checks written to homeowners, but offered no explanation for his actions. Appellant also admitted that he did not return Ms. Winn's deposit for her cancelled reservation.

*Verdict*

Appellant was convicted of four counts of theft over one thousand dollars, a Class D felony, two counts of theft over five hundred dollars, a Class E felony, and one count of impersonation of a licensed professional, a Class E felony. The trial court ordered the sentences to run concurrently, for a total effective sentence of four years. The trial court further ordered Appellant to serve 200 days of the sentence day-for-day, with the balance of the sentence to be served on supervised probation. Appellant was ordered to pay $1,550.84 in restitution to Mr. Ingalls, $6,875.16 in restitution to Mrs. Shelton, $7,496.08 to Mr. Gilbert, $4,400 to Mr. Webb, $635.75 to Mrs. Winn, and $961.54 to Mrs. Miller. Appellant was ordered to pay $750 per month toward restitution until it is paid in full.

*Analysis*

*Impersonation of a Licensed Professional*

Initially, Appellant claims that the trial court "erroneously concluded that Appellant was a licensed professional because a vacation lodging service 'is a profession that requires a license,' and erroneously charged the jury on this offense." Specifically, Appellant contends that a vacation lodging service is merely required to maintain a firm license rather than an individual license. Appellant argues that he could not be guilty of impersonation of a licensed professional because he was not engaged in a business that required a "license certifying the qualifications of such licensee to practice the profession" as required by T.C.A. § 39-16-302(a). The State counters that the evidence was sufficient to convict Appellant and the trial court properly charged the jury with the crime because the statute at issue required the business to "have a license certifying the qualifications of such licensee to practice and the [proof indicated that Appellant] was not licensed to practice in this profession in the State of Tennessee because his license had been revoked by the State."

Appellant's main argument centers around the contention that the "exemption of vacation lodging services from the requirement of operation by a licensed real estate professional is . . . demonstrated by its exclusion from the penalties associated with practicing without a real estate license." Appellant argues that because the General Assembly requires the vacation lodging service to have a firm license rather than requiring an individual to have a license to work as a vacation lodging service, the General Assembly intended to exempt vacation lodging services from being considered a profession requiring a "license certifying the qualifications of such licensee to practice the profession . . . ." T.C.A. § 39-16-302(a). In other words, Appellant argues that because there is no requirement of an individual professional license prior to operating as a vacation lodging service, Appellant could not be convicted of impersonation of a licensed professional.

Appellant was charged with violating T.C.A. § 39-16-302. That statute makes it a crime to impersonate a licensed professional. It states, "It is unlawful for any person who is not licensed to do so, to practice or pretend to be licensed to practice a profession for which a license certifying the qualifications of such licensee to practice the profession is required." T.C.A. § 39-16-302(a). In order to obtain a conviction pursuant to that statute, the State must prove beyond a reasonable doubt that a defendant: (1) practiced or pretended to be licensed to practice as a certain professional; (2) that the profession at issue is a profession in the State of Tennessee requiring a license certifying the qualifications of such licensee to practice; (3) that the defendant was not licensed to practice in the profession in the State of Tennessee; and (4) that the defendant acted either intentionally, knowingly, or recklessly. *See* Tennessee Pattern Jury Instructions - Crim. 24.03 (6th ed. 2005).

Appellant concedes that he continued to operate as a vacation lodging service after the revocation of the firm license by the State of Tennessee. Thus, the primary issue in this case is whether a "vacation lodging service" is a profession which requires licensure. In order to make that determination, we turn to the principles of statutory construction. The basic rule of statutory construction is to ascertain and give effect to the intent or purpose of the legislature as expressed in the statute. *Metropolitan Gov't of Nashville & Davidson Co. v. Motel Sys., Inc.*, 525 S.W.2d 840, 841 (Tenn. 1975); *State v. Southland News Co., Inc.*, 587 S.W.2d 103, 106 (Tenn. Crim. App. 1979). We must consider the "natural and ordinary meaning of the language used, when read in the context of the entire statute, without any forced or subtle construction to limit or extend the import of that language." *Worrall v. Kroger Co.*, 545 S.W.2d 736 (Tenn. 1977).

While it is true that T.C.A. § 1-3-109 provides that the headings to statutes are not part of the statutes themselves, it is perfectly permissible under widely accepted principles of statutory construction to look to these headings in the quest to determine legislative intent. *See* 2A Norman J. Singer, *Sutherland's Statutory Construction*, § 47:14 (6th ed. 2000). This is particularly true when the heading was part of the public act enacted by the legislature and not merely the code compiler's opinion as to the topic embraced in the statute. *Id.* The public act adopted by the General Assembly of Tennessee and later codified at T.C.A. § 62-13-101 includes the heading "Real Estate Brokers" and should be cited as the "Tennessee Real Estate Brokers License Act of 1973" and is therefore not simply the code compiler's opinion. *See* 1973 Tenn. Public Acts ch. 181 § 1. Thus, the legislature, in its enactment of this statute, must have intended it to regulate the licensure of real estate brokers.

Further, this Act appears in Title 62 of the T.C.A. which is labeled "Professions, Businesses and Trades."

According to T.C.A. § 62-13-104(7), the provisions of chapter thirteen do not apply to "[t]he services performed by a vacation lodging business pursuant to subsection (b)." A vacation lodging service is defined in T.C.A. § 62-13-104(7)(b)(1)((B) as "any person who engages in the business of providing the services of management, marketing, booking and rental of residential units owned by others as sleeping accommodations furnished for pay to transients or travelers staying not more than fourteen (14) days." However, T.C.A. § 62-13-104(7) also lists the requirements for a vacation lodging service and the licensure of a vacation lodging service. It states, in pertinent part:

> [A vacation lodging service shall] have a firm license but shall not be required to have a licensed real estate broker supervising such business. The application for such license shall be filed in the office of the real estate commission on such forms as the commission may prescribe and shall be accompanied by a fee for the issuance of such license as specified in § 62-13-308. A real estate firm license held by a real estate broker is deemed to satisfy the license requirements of subsection (b).

T.C.A. § 62-13-104(7)(b)(2). A vacation lodging service license is "granted to all applicants who bear a good reputation for honesty, trustworthiness, integrity and competence to transact the business of providing vacation lodging services in such manner as to safeguard the interest of the public, and only after satisfactory proof of such qualifications has been presented to the commission." T.C.A. § 62-13-104(7)(b)(3)(A). When a vacation lodging service receives a license and upon renewal of the license, it must:

> designate one (1) individual from that firm who shall be responsible for the completion of training programs consisting of instruction in the fundamentals of subsection (b) and related topics. Every two (2) years, as a requisite for the reissuance of a firm license for a vacation lodging service, the firm shall furnish certification of completion of eight (8) classroom hours in training programs approved by the commission. No examination shall be required for the issuance or renewal of a firm license for a vacation lodging service.

T.C.A. § 62-13-104(7)(b)(3)(B). T.C.A. § 62-13-104(7)(b) also lists the requirements that each vacation lodging service must follow for maintenance of its escrow accounts.

Each license for a vacation lodging service expires two years from the date of issuance. T.C.A. § 62-13-104(7)(b)(4). In order to renew a license for a vacation lodging service, a vacation lodging service must "remit to the commission the fee as set by the commission, together with proof of the existence of the firm's escrow account satisfactory to the commission, and certification of satisfactory completion of training pursuant to subdivision (b)(3)(B)." *Id.*

Looking at the principles of statutory construction along with the language of the statutes creating and regulating vacation lodging services in Tennessee, we conclude that the requirements for licensure of a vacation lodging service, especially the requirement that the firm designate one person responsible for the completion of training programs approved by the commission, evince an intent of the legislature to treat the vacation lodging service like professions requiring a license in the State of Tennessee. While vacation lodging services are specifically excluded from the rest of Chapter 13 by way of T.C.A. § 62-13-104(7), the statute creating vacation lodging services contains the requirements for licensure of vacation lodging services. From these requirements, we conclude that a vacation lodging service is a profession which requires a "license certifying the qualifications of such licensee to practice the profession." *See* T.C.A. § 39-16-302. Thus, we conclude that because operation of a vacation lodging service is a profession, Appellant was properly charged with a violation of impersonation of a licensed professional.

### *Sufficiency of the Evidence*

Next, Appellant argues that the evidence was insufficient to convict him of theft because there was no showing that he intended to deprive the owners of their property. Further, Appellant argues that the evidence was insufficient to convict him of impersonation of a licensed professional where there was no requirement that he be licensed individually. The State argues that the evidence supports Appellant's convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W. 2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

As stated previously, Appellant was charged with violating T.C.A. § 39-16-302. That statute makes it a crime to impersonate a licensed professional. It states, "It is unlawful for any person who is not licensed to do so, to practice or pretend to be licensed to practice a profession for which a license certifying the qualifications of such licensee to practice the profession is required." T.C.A. § 39-16-302(a). Looking at the evidence in a light most favorable to the State, the evidence shows that Appellant knowingly continued to operate a business as a vacation lodging service after the license was revoked. The license was revoked on March 9, 2001, and Appellant continued to do business as a vacation lodging service after that date. There was ample proof to convict Appellant of impersonation of a licensed professional.

Appellant was also convicted of six counts of theft. "A person commits theft of property if, with intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Again, viewing the evidence in a light most favorable to the State, the evidence included testimony from several witnesses who owned cabins in the Gatlinburg area who participated in the rental program offered by Great Smoky Mountain Vacation Rentals and who were owed money by Appellant. James Ingalls testified that he was owed $1,550.84 from Great Smoky Mountain Vacation Rentals. According to his rental agreement, the money was supposed to be held in an escrow account until it was released to him.

Terry Shelton testified that she received a check from Appellant for the September 2001 rental of her cabin in the amount of $891.22. When Mrs. Shelton deposited the check signed by Appellant, it was returned for insufficient funds. Mrs. Shelton also discovered that Appellant rented her cabin in October and November of 2001, but testified that she never received any money for these rentals.

Yates Gilbert explained that he had two homes on the rental program with Great Smoky Mountain Vacation Rentals. Mr. Gilbert testified that at some point he stopped receiving checks from Appellant, so he went to Gatlinburg to locate Appellant and inquire about the missing rental income. Mr. Gilbert was given a check for the November rentals and later received two more checks in the mail. When Mr. Gilbert attempted to deposit the checks, he discovered that Appellant had stopped payment on all three of these checks. The checks were for the amounts of $2,000.72, $2,144.90 and $351.18.

Glenn Carlton Webb testified that he also owned a cabin on the rental program with Appellant. Mr. Webb received a check for September 2001 rentals in the amount of $960.80, but the check was returned for non-sufficient funds. Mr. Webb attempted to contact Appellant several times, but Appellant never returned Mr. Webb's messages. Mr. Webb testified that Appellant owed him $4,400 for rental income.

Amy Winn placed a deposit on a cabin in January of 2001 in the amount of $635.75. She was later forced to cancel the reservation due to family health problems, but was unable to receive

a refund from Great Smoky Mountain Vacation Rentals, even after contacting them several times. According to the rental agreement, Ms. Winn was entitled to a 90% refund of her deposit.

Connie Miller testified that she owned a home on the rental program with Appellant. She received a check in November of 2001 in the amount of $961.54. When she attempted to deposit the check, it was returned for non-sufficient funds.

The Tennessee Real Estate Commission audited the books of Great Smoky Mountain Vacation Rentals and discovered that the escrow account was deficient in the amount of approximately $87,000. William O. Stewart performed the audit and reported his findings to the Tennessee Real Estate Commission. As a result, the commission revoked the license of Great Smoky Mountain Vacation Rentals.

We conclude that the evidence amply supports Appellant's convictions for theft. A rational jury could have concluded, based on the proof at trial, that Appellant intended to deprive each of the owners of their property and that Appellant knowingly exercised control over the money when he refused to make payment when the money was due. This issue is without merit.

*Sentencing*

Lastly, Appellant contends that the trial court erroneously sentenced Appellant to the maximum sentence for each conviction because the trial court placed "too much weight" on several enhancement factors and utilized two non-statutory enhancement factors to increase Appellant's sentence. Further, Appellant argues that the trial court failed to consider mitigating factors like cooperation with the court, a demonstrated intent to make restitution, and an obligation to support his family. Appellant also argues that the trial court should have granted him a sentence of full probation. The State disagrees, arguing that the trial court properly sentenced Appellant.

"When reviewing sentencing issues . . . , the appellate court shall conduct a *de novo* review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. T.C.A. §§ 40-35-103(5), -210(b); *Ashby*, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169. In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of

sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).[1]

In the case herein, Appellant was convicted of four counts of theft over one thousand dollars, a Class D felony, two counts of theft over five hundred dollars, a Class E felony, and one count of impersonation of a licensed professional, a Class E felony. *See* T.C.A. §§ 39-14-103, 39-16-102. The sentencing range for a Range I offender convicted of a Class D felony is not less than two nor more than four years. *See id.* § 40-35-112(a)(4). The Range I sentence for a Class E felony is not less than one nor more than two years. *See id*. § 40-35-112(a)(5).

The trial court herein determined that there were two enhancement factors present and no mitigating factors and applied the enhancement factors to all of Appellant's convictions. Specifically, the trial court determined that Appellant had a previous history of criminal convictions or criminal behavior and that Appellant abused a position of public or private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense. T.C.A. §§ 40-35-114(2), (16) (2003).[2] The trial court also noted that there were "other people whom [Appellant] has embezzled from" and that there was a finding by the Real Estate Commission that Appellant's "accounting methods were not up to par." The trial court chose not to give much weight to the non-statutory mitigating factors, but felt that the statutory enhancement factors justified a four-year sentence for each Class D felony and a two-year sentence for each Class E felony.

The record indicates that Appellant had two prior misdemeanor convictions for passing worthless checks. T.C.A. § 40-35-114(2) (2003) does not require that prior convictions be felonies. *See State v. Williamson*, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (upholding the application of this enhancement factor when defendant had only one prior conviction for driving under the

---

[1] In response to *Blakely v. Washington*, 542 U.S. 296 (2004), the Tennessee Legislature amended T.C.A. § 40-35-210 so that felonies now have a presumptive sentence beginning at the minimum of the sentencing range. *Compare* T.C.A. § 40-35-210(c) (2003) *with* T.C.A. § 40-35-210(c) (2006). This amendment became effective on June 7, 2005. The legislature also provided that this amendment would apply to defendants who committed a criminal offense on or after June 7, 2005. 2005 Tenn. Pub. Act ch. 353, § 18. In addition, if a defendant committed a criminal offense on or after July 1, 1982 and was sentenced after June 7, 2005, such defendant can elect to be sentenced under these provisions by executing a waiver of their ex post facto protections. *Id.* Appellant herein committed the offenses between May of 2000 and January of 2002 and was sentenced on November 28, 2005. There is no waiver executed by Appellant in the record herein. Thus, the amendment to T.C.A. § 40-35-210 does not apply to Appellant.

[2] The numbering of the enhancement factors enumerated in T.C.A. § 40-35-114 has been revised several times over the past few years. For the sake of clarity and consistency, and because Appellant chose not to sign a waiver of his ex post facto protections, we refer to the enhancement factors by their designations in the 2003 bound volume of the T.C.A.

influence); *State v. Samuel Paul Fields*, No. 01C01-9512-CR-00414, 1998 WL 79917, at *9 (Tenn. Crim. App., at Nashville, Feb. 26, 1998), *perm. app. denied*, (Tenn. Nov. 2, 1998) (upholding the application of this enhancement factor where defendant had only one prior misdemeanor conviction and factor given little weight); *State v. Willie Givens*, No. M2000-02883-CCA-R3-CD, 2002 WL 1400049, at *18 (Tenn. Crim. App., at Nashville, June 28, 2002) (stating that where defendant had only one prior misdemeanor conviction for writing worthless checks, application of enhancement factor was entitled to little weight). Due to the nature of the previous offenses, we determine this enhancement factor was properly applied, but entitled to little weight.

The record also supports the application of enhancement factor (16), abuse of private trust. It is clear that Appellant abused his position as a fiduciary by withholding money from owners of the cabins that had rental agreements with Great Smoky Mountain Vacation Rentals. Per their agreements with Appellant, Appellant was entrusted with the victims' cabins and money, which was required by law to be held in an escrow account until the funds were distributed to the victims. Appellant, acting as a fiduciary to the victims, used money from this escrow account inappropriately, without paying the victims the money that they were entitled to receive from their rental properties. Further, Appellant repeatedly sent the owners checks on which he had stopped payment and checks that were returned for non-sufficient funds. Here, Appellant's actions exploited his fiduciary relationship with the victims which resulted in an abuse of a private trust. Because the trial court properly determined that enhancement factors (2) and (16) applied, the trial court was justified in enhancing Appellant's sentences beyond the minimum of the range.

The trial court chose not to give any weight to the mitigating factors proposed by Appellant, including his cooperation with the court, his demonstrated intent to make restitution, and his continued support of a wife and three children. "The weight afforded mitigating or enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances . . . . In other words, the weight that is given to any existing factors is left to the trial court's discretion so long as . . . its findings are supported by the record." *State v. Marshall*, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). We chose not to disturb the trial court's determinations with regard to the application of mitigating factors.

*Denial of Total Probation*

In regards to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, the trial court must presume that a defendant sentenced to eight years or less is an offender for whom a sentence other than incarceration would result in successful rehabilitation. *State v. Byrd*, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); *see also* T.C.A. § 40-35-303(a).

Appellant herein was found guilty of four counts of theft over one thousand dollars, a Class D felony, two counts of theft over five hundred dollars, a Class E felony, and one count of impersonation of a licensed professional, a Class E felony. Because Appellant was convicted of Class D and E felonies and sentenced to fewer than eight years for the offense, Appellant was eligible for probation and was presumed to be a favorable candidate for alternative sentencing. *See* T.C.A. §§ 40-35-102(6) & -303(a); *Byrd*, 861 S.W.2d at 379-80. However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. *See State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under T.C.A. § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

T.C.A. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider T.C.A. § 40-35-103(5), which states, in pertinent part, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5); *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994).

At the conclusion of the sentencing hearing, the trial court noted that Appellant was presumed eligible for alternative sentencing. However, the court noted that Appellant "looted" the accounts of the cabin owners and that the testimony of the victims "indicated a continuous actions [sic] on the part of [Appellant] to keep them from discovering what was in their accounts, and to keep them from knowing the full extent of what happened." The trial court noted that

[Appellant's] remorse or lack of it, or his admission of guilt or lack of it is not something that this Court can consider. But the Court does, and the jury found all issues of fact and truth against this Defendant. It was overwhelming as to his guilt. And the constant and continuous obstruction and refusal to talk to these people, to give them any honest assessment of what was going on is - - is, I think, very - - an aggravating factor in determining whether or not he should get straight probation.

The Court thinks that, based upon the testimony at the trial, the exhibits here from the real estate commission, and all those other things, sworn affidavits of people as to moneys lost and so forth, that he needs to serve some jail time. You know, that to do otherwise just smacks of - - of an injustice.

Thus, the trial court determined that confinement was necessary to avoid depreciating the seriousness of the offense and seemed to place some weight on Appellant's lack of candor with the court. Probation may be denied based solely upon the circumstances surrounding the offense. *State v. Hartley*, 818 S.W.2d 370, 374 (Tenn. Crim. App. 1991). To deny probation solely on these grounds, however, the offense "must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or an exaggerated degree." *Id.* Appellant argues that his offenses do not rise to this level, and we agree. However, circumstances which do not rise to a level which justifies denial of any alternative sentencing may nevertheless justify a denial of full probation. *State v. Bingham*, 910 S.W.2d 448, 455-56 (Tenn. Crim. App. 1995). In addition, a defendant's lack of credibility or his or her failure to acknowledge culpability may reflect on the potential for rehabilitation and support a finding that a period of confinement is necessary to avoid depreciating the seriousness of an offense. *State v. Gutierrez*, 5 S.W.3d 641, 647 (Tenn. 1999); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). We agree with the trial court that Appellant's lack of candor and remorse provided an additional basis for denying probation. Appellant's actions herein, including a willingness to continue operating as a vacation lodging service after the revocation of his license and the testimony of the victims as to their countless unsuccessful efforts to contact Appellant to remedy the checks demonstrate a clear inability to accept responsibility for his criminal conduct. Accordingly, we determine that Appellant has failed to show that the trial court's denial of full probation was improper. Consequently, we conclude that the trial court properly ordered Appellant to serve some time in incarceration and the remainder of the sentence on supervised probation. This issue is without merit.

*Manner of Service of Sentence*

Although not raised by either party on appeal, we note that the trial court improperly ordered Appellant to serve 200 days of the sentence *day-for-day*, with the balance of the sentence to be served on supervised probation. It is well-settled that

[w]here a period of confinement is imposed, an order of day-for-day service is impermissible because a trial court cannot deny a defendant the statutory right to earn

-16-

good conduct credits or authorized work credits where the defendant receives a sentence of split confinement and becomes a county jail inmate.

*State v. Tim Mattingly*, No. M2002-02765-CCA-R3-CD, 2003 WL 22038777, at *3 (Tenn. Crim. App., at Nashville, Sept. 2, 2003). *See also State v. Chris E. Hixon*, No. M2002-03141-CCA-R3-CD, 2004 WL 741670, at *2 (Tenn. Crim. App., at Nashville, Apr. 7, 2004). Because the trial erred with respect to the day-for-day sentence service, we reverse the judgment of the trial court as to sentencing and remand for entry of a judgment deleting the day-for-day service requirement.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed in part and reversed in part. The matter is remanded to the trial court for entry of judgments in accordance with this opinion.

_____
JERRY L. SMITH, JUDGE